UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| AMANDA CULLEN, <br><br> PLAINTIFF <br><br> v. <br><br> HALL AUTOMOTIVE, LLC <br><br> DEFENDANT. | CASE NO. 2:21-cv-00047 <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff Amanda Cullen and submits the following Complaint against Defendant Hall Automotive, LLC ("Hall" or "Defendant").

### PARTIES

1. Cullen is an individual domiciled in Virginia Beach, Virginia and a former employee of Defendant. Cullen was employed by Defendant for over 12 months and worked at least 1,250 hours for Defendant during the 12-month period preceding her termination. For the duration of Cullen's employment, Defendant employed at least 50 employees within 75 miles of her worksite. Accordingly, at all times relevant, Cullen was an "employee" and "eligible employee" as those terms are defined by the FMLA. *See* 29 U.S.C. § 2611(2)(A)-(B); 29 CFR § 825.110(a).

2. Hall is a limited liability company organized under Virginia law with a principal place of business located in Virginia Beach, Virginia. Hall is engaged in an industry affecting commerce and employed at least 50 employees for at least 20 or more calendar workweeks in each calendar year during which Cullen was employed. Accordingly, at all times relevant, Defendant

was an "employer" and "covered employer" as those terms are defined by the FMLA. *See* 29 U.S.C. § 2611(4)(A), 29 CFR § 825.104(a).

## JURISDICTION & VENUE

3. This Court has subject matter jurisdiction over Cullen's claims pursuant to 28 U.S.C. § 1331.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Hall is a resident of this judicial district and it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

### Cullen is employed by Hall and advances rapidly

5. Hall is an automobile dealership that sells both new and used vehicles and also sells services and accessories for vehicles.

6. Cullen was employed by Hall as a cashier starting January 3, 2018 with an hourly wage of $10.50.

7. Cullen quickly earned a reputation at Hall as an assiduous and reliable employee.

8. Accordingly, on August 4, 2018, Hall assigned Cullen additional job duties and raised her pay to $12.00 per hour.

9. Cullen continued to excel at Hall, and, on November 11, 2018, she received another promotion to the position of Internal Service Advisor, with a corresponding pay raise to $15 per hour.

10. On December 12, 2018, Hall again promoted Cullen, this time to a salaried position where she earned $1425.00 bi-weekly. Cullen's job title continued to be Internal Service Advisor.

### Cullen's job as an Internal Service Advisor

11. As an Internal Service Advisor, Cullen's typical work hours were 7:00a.m. to 5:00p.m.

12. In this capacity, Cullen was primarily responsible for administrative office work. Her primary job duties included drafting Report of Sales documents for new vehicles; preparing paperwork for customers who were purchasing services or products for new vehicles; facilitating rental car arrangements for customers who were having work done on their vehicles; and recording information about services or repairs that technicians had completed on vehicles.

13. Though Cullen periodically met with customers, she typically saw five or fewer customers per day for a few minutes at a time.

14. Moreover, as an Internal Service Advisor, Cullen was rarely responsible for performing manual labor, and she performed the majority of her job duties while sitting at a desk in Hall's air-conditioned dealership building.

### Cullen develops a serious health condition and goes on leave under the Family and Medical Leave Act

15. In early January 2019, Cullen began to experience a series of symptoms, including severe chest pains, dizziness, and vomiting.

16. On January 20, 2019, Cullen was admitted to the hospital for pancreatitis. She remained in the hospital for treatment until February 1, 2019. During this time, David Cramer, Cullen's immediate supervisor and the Service Manager at Hall, was notified about Cullen's condition.

17. On February 11, 2019, Cullen returned to work but continued to experience severe symptoms, including vomiting, abdominal cramps, incontinence, and an inability to eat.

18. In or around March 2019, Cullen was diagnosed by Dr. Whitney Brooks with

3

Ulcerative Colitis ("UC"), a serious health condition that causes irritation, inflammation, and ulcers in the lining of the large intestine.

19. Later that month, Cullen submitted documentation to Hall formally requesting leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, et seq., for treatment of her UC.

20. At that time, Cullen had been working approximately 40 hours per week since the beginning of her employment at Hall, and she had performed well in excess of 1,250 service hours over the previous 12 months.

21. Hall approved Cullen's request for FMLA leave, which officially began on February 15, 2019.

**Cullen returns from FMLA leave, and Hall refuses to reinstate her to the same or equivalent position**

22. In early April 2019, Cullen returned to work at Hall.

23. Though Cullen continued to experience symptoms of UC, she had developed a treatment regimen during her FMLA leave that would allow her to return to work in her previous position as an Internal Service Advisor with the appropriate accommodations.

24. At or around the time that Cullen returned to Hall, she was informed that the position she held before she began FMLA leave—Internal Service Advisor—had been filled and that she would instead be required to return to Hall in a different position.

25. Though the position in which Hall placed Cullen after she returned did not have an official title, it was essentially that of a Lot Attendant or a Service Help Desk Greeter.

26. Cullen's job in her new position was substantially different than that of her previous job as an Internal Service Advisor.

27. In her new position, Cullen was required to stand outside with an iPad and check-

4

in customers as they brought their vehicles to the dealership for service.

28. After she checked-in customers, Cullen was required to either park customer vehicles onsite or drive them across the street to a technician. Cullen was then required to retrieve customer vehicles after the service was complete.

29. When customer vehicles were brought across the street, Cullen would be required to either walk back to the main retail building after dropping off a vehicle and/or walk across the street to retrieve a vehicle after service had been completed.

30. Cullen's new job duties required her to be on her feet or moving almost constantly and to interact with dozens of customers daily.

**Hall disregards Cullen's objections to her new job, and Cullen experiences a resurgence of her symptoms**

31. Cullen advised David Cramer that she objected to being placed in the Service Help Desk Greeter position both because it was not equivalent to the Internal Service Advisor Position and because it required her to perform tasks and work in an environment that aggravated her UC.

32. Cramer responded to Cullen's objections by stating that this was the only job she could have and that she would need to work her way back up to her original position.

33. Following her conversation with Cramer, Cullen contacted Wendy Hieves, a corporate representative for Hall, and reiterated her objection to the new position.

34. Wendy Heives advised Cullen that Cullen would not be placed in this new position and that Hieves would contact Cramer to resolve the issue. Unfortunately, neither Cramer nor Hieves followed up with Cullen about returning her to the Internal Service Advisor job or a comparable position. Instead, Cramer told Cullen that Hall had to create her new position because Hall could not otherwise pay her old salary for a position that was tantamount to a lot attendant or help desk job.

35. In early April 2019, shortly after Defendant placed Cullen in the Service Help Desk Greeter position, she started experiencing frequent flare-ups of her UC symptoms.

36. In or around May 2019, Cullen's condition became so severe that she was forced to go to the emergency department twice in one week. Around this time, multiple medical providers advised Ms. Cullen that she should not continue to work in the dissimilar position in which Defendant had placed her.

**Hall disregards the effects of the new position on Cullen's medical condition and continues to refuse to return Cullen to a comparable position to Internal Service Advisor**

37. On or around April 26, 2019, Cullen received a letter from Nurse Practitioner Ma Daphine Pasia recommending certain work accommodations that Cullen would need based to manage her UC and pancreatic insufficiency.

38. Cullen gave the letter to Cramer; however, Cramer did not open the letter. Instead, Cramer told Cullen that she should go home for one week and that he would contact her.

39. After one week passed with no word from Hall, Cullen contacted Martha Kerns, the Senior Office Manager, seeking an update on Cullen's job status.

40. Kerns asked Cullen if Cullen had obtained a doctor's note about her condition, and Cullen advised Kerns about the letter she had provided to Cramer. Upon information and belief, Cramer had not even opened the letter at that time; rather, Cramer had falsely informed Kerns that Cullen had quit her job.

41. During this same conversation, Kerns mentioned to Cullen the possibility of returning Cullen to her cashier position with less pay.

42. Shortly thereafter, Cullen contacted Rick Crozier, the Human Resources Manager, and requested to be put back into the Internal Service Advisor job or a comparable position. Crozier was extremely dismissive of Cullen's request and responded that so long as Cullen was receiving

6

the same pay as she had been receiving before her FMLA leave, Hall was in compliance with the law.

43. On June 18, 2019, Cullen met with Papa Seck, the General Manager, as well as Cramer and Kerns. During the meeting, Cullen was told that she had the option of either continuing in the new position as a Service Help Desk Greeter/Lot Attendant or being demoted to a cashier with less pay. Cullen stated that neither job satisfied Hall's obligation to restore her to an equivalent position under the FMLA. In response, Kearns stated, "HR said you could pick up dog sh** as long as we pay you the same." Seck also stated, "if I got payed the same as a GM to do a lower job I would."

### Hall terminates Cullen for attempting to enforce her FMLA rights

44. On June 20, 2019, Cullen again spoke with Crozier requesting, among other things, to be restored to a position comparable to an Internal Service Advisor that accommodated her UC. She expressed to Crozier that she believed Hall was violating her FMLA rights. For the first time, Crozier told her that he was placing her in the position of an "Express Service Advisor".

45. Crozier also told her that if she did not show up to work for that position, he would "accept this as [her] resignation."

46. The Express Service Advisor was also substantially different from the Internal Service Advisor Position. Indeed, the Express Service Advisor position would not only have required Cullen to work with a different set of repair orders and codes, but it would also have required that she work in a garage during the summer without functioning air conditioning. It would have further required her to regularly move around and park cars, which was incompatible with the accommodations crafted by her healthcare provider.

47. In addition to the differing job duties, the Express Service Advisor position would

Case 2:21-cv-00047-AWA-RJK   Document 1   Filed 01/22/21   Page 8 of 11 PageID# 8

have required Cullen to work on a different schedule. Rather than her 7:00a.m. to 5:00p.m. weekday schedule as an Internal Service Advisor, the Express Service Advisor position would require Cullen to work 11:00a.m. to 7:00p.m. on most weekdays as well Saturdays.

48. Cullen again reiterated the violation of her FMLA rights, insisting that she was supposed to get an identical or equivalent job. Crozier told her, "this is probably not gonna work out."

49. Eventually, Crozier insisted that Cullen attempt to do the Express Service Advisor job.

50. On June 21, 2019, Cullen appeared at work for the Express Service Advisor job; however, before she started, Cramer called her into his office and advised her that the Express Service Advisor position would still be in the heat. He also informed her that he did not want to train her for this position because she may not be able to do it.

51. Following this discussion with Cramer, Cullen contacted Crozier to advise him about Cramer's concerns and express her own concerns about her new schedule. Cullen also expressed her concerns about her FMLA rights, at which point Crozier interrupted, stating, "you're not on FMLA."

52. Eventually, Crozier told Cullen that the two positions she had been offered after FMLA were the only positions she would be offered and if those positions did not work, they would "accept her resignation."

53. Cullen stated that she was not resigning and insisted that she get a job that she be provided a job that complied with her FMLA rights and Hall's FMLA obligations. She also objected to the fact that the job she had been working after returning from leave did not comply with the FMLA.

8

54. Crozier then told Cullen, "we'll just consider this your termination, how's that?" He then told Cullen that she was terminated and that he would talk to Cramer to do the paperwork.

55. Effective on that date, Cullen was terminated from Hall.

## COUNT I—FMLA INTERFERENCE

56. Cullen incorporates the preceding paragraphs by reference.

57. At all relevant times, Hall was an "employer" within the meaning of the FMLA. *See* 29 U.S.C. § 2611(4); 29 CFR § 825.104(a).

58. At all relevant times, Cullen was an "[e]ligible employee" within the meaning of the FMLA. *See* 29 U.S.C. § 2611(2); 29 CFR § 825.110(a).

59. Beginning on or about February 15, 2019, Cullen became entitled to leave under the FMLA and timely notified Hall of her intention to take leave.

60. Cullen took FMLA leave effective February 15, 2019 until on or around April 2, 2019.

61. Upon her return from FMLA leave, Hall was required to restore Cullen to the position she held upon the commencement of her leave or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. See 29 U.S.C. § 2614(a)(1).

62. Hall interfered with Cullen's FMLA rights and denied her benefits under the FMLA by refusing to restore her to her original position or an equivalent position with equivalent benefits, pay, and/or other terms and conditions of employment.

63. Hall's actions were intentional, willful, in bad faith, and with reckless disregard to Cullen's right to be free from interference with her FMLA rights.

64. As a direct and proximate result of Hall's interference with Cullen's FMLA rights,

Cullen has been prejudiced and suffered substantial damages.

## COUNT II—FMLA RETALIATION

65. Cullen incorporates the preceding paragraphs by reference.

66. At all relevant times, Hall was an "employer" within the meaning of the FMLA. *See* 29 U.S.C. § 2611(4); 29 CFR § 825.104(a).

67. At all relevant times, Cullen was an "[e]ligible employee" within the meaning of the FMLA. *See* 29 U.S.C. § 2611(2); 29 CFR § 825.110(a).

68. Cullen engaged in protected activity under the FMLA when she requested and took leave under the FMLA and thereafter sought reinstatement to her original position or its substantial equivalent.

69. Hall took a series of adverse actions against Cullen in retaliation for exercising her rights under the FMLA, including, without limitation, i) placing her in a position that exacerbated her medical condition and ii) terminating her employment.

70. Hall's actions were intentional, willful, in bad faith, and with reckless disregard to Cullen's right to be free from retaliation under the FMLA.

71. As a direct result of Hall's retaliatory actions, Cullen has suffered substantial damages.

## PRAYER FOR RELIEF

72. WHEREFORE, Cullen respectfully requests that the Court entered judgment in her favor granting her legal and equitable relief as the Court may deem just, including, but not limited to:

   a. an Order requiring Defendant to implement and enforce FMLA policies in a lawful manner;

    b.  front and back pay;

    c.  compensatory damages;

    d.  liquidated damages;

    e.  reinstatement;

    f.  pre-judgment and post-judgment interest;

    g.  reasonable attorneys' fees and costs; and

    h.  any other relief to which Cullen is entitled by law and to which the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Amanda Cullen demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 22, 2021

Respectfully submitted,

_____/s/_____
Ben D. Johnson (VSB No. 90812)
PIERCE MCCOY, PLLC
313 East Broad St., Suite 315
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: (757) 257-0387
bjohnson@piercemccoy.com

Aaron D. Siegrist (VSB No. 91072)
Pierce MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Tel: (757) 286-2903
Fax: (757) 257-0387
asiegrist@piercemccoy.com

*Counsel for Plaintiff Amanda Cullen*

11